**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Center for Biological Diversity, et al., | ) | No. 12-CV-8088-PCT-PGR |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| United States Forest Service, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court are the parties' cross motions for summary judgment. (Docs. 27, 33.) Plaintiffs are the Center for Biological Diversity and the Sierra Club.[1] Their amended complaint, filed June 21, 2012, challenges the Forest Service's decision to authorize a "vegetation management" project (the "Jacob-Ryan" project) in the Kaibab National Forest. (Doc. 16.) Plaintiffs allege that the Forest Service has implemented a change in the management of the northern goshawk without complying with the procedural requirements of the National Forest Management Act and the National Environmental Policy Act.

Plaintiffs filed a motion for summary judgment on August 18, 2012. (Doc. 27.) The Forest Service filed its summary judgment motion on September 13, 2012. (Doc. 33.) The Court held oral argument on December 18, 2012.

For the reasons set forth herein, the Court will grant summary judgment in favor of the Forest Service.

---

[1] On June 31, 2012, the Court granted the motion to intervene filed by the Town of Fredonia, Arizona, and Kane County, Utah. (Doc. 26.)

## I. BACKGROUND

### A. Forest Plan

The Forest Plans in the Southwest Region, including the plan for the Kaibab National Forest, were developed in the mid to late 1980s. (AR 8419.)[2] Due to concern over the impacts of logging on the viability of the goshawk, a "sensitive species," the Forest Service created a scientific committee to review the goshawk's habitat needs. In 1992, the committee issued its report, "Management Recommendations for the Northern Goshawk in the Southwestern United States."

The Recommendations identified three components of goshawk habitat: the nest area, the post-fledgling family area, and the foraging area. (AR 183–84.) The Recommendations then set forth the desired conditions for goshawk habitat in terms of forest age classes, or "vegetation structural stages" ("VSS"). VSS is "a forest description based on the tree diameter distribution within a stand." (AR 187.) VSS 1 refers to "grass/forb/shrub," VSS 2 to "seedling-sapling," VSS 3 to "young forest," VSS 4 to "mid-aged forest," VSS 5 to "mature forest," and VSS 6 to "old forest." (*Id.*) For post fledgling and foraging areas, the following conditions are recommended: 10% VSS 1, 10% VSS 2, 20% VSS 3, 20% VSS 4, 20% VSS 5, and 20% VSS 6. (*Id.*) Thus 40% of the forest is recommended to be comprised of VSS 5 and 6, meaning "mature" and "old growth" forests. (*Id.*)

The 1992 Management Recommendations set forth the recommended minimum canopy cover within VSS 4, 5, 6.[3] (*Id.*) Canopy cover within VSS 4, 5, and 6, in ponderosa pine forests, is recommended to be at least 50% in post-fledgling family areas and at least 40% in foraging areas. (AR 187.)

---

[2] "AR" refers to the Administrative Record lodged with the Court on July 13, 2012. (Doc. 24.)

[3] Canopy is "[a] layer of foliage, generally the uppermost layer, in a forest stand," while "canopy cover" refers to "[t]he percentage of a fixed area covered by crowns or plants." (AR 8673.)

- 2 -

In 1992, the Forest Service began preparing an environmental impact statement ("EIS") to consider increased protections for the goshawk and Mexican spotted owl in the Southwest Region. The EIS was completed in 1995, and the Record of Decision issued in 1996. The Record of Decision amended all Forest Plans in the Southwest Region, including the Kaibab Forest Plan, to include new standards and guidelines for the protection of goshawks. (AR 8686, 8696, 8768.) The 1996 Amendment largely adopted the 1992 Management Recommendations for goshawks, including incorporating the same guidelines for VSS 1–6 distribution and for canopy cover percentages within VSS 4–6. (AR 3709-10.) The 1996 Amendment directs the Forest Service to refer to the 1992 Management Recommendations for scientific information on goshawk ecology and management "which provide the basis for the management guidelines." (AR 3708.)

### B. Jacob-Ryan Project

The Jacob-Ryan project is located in the north-central portion of the Kaibab Plateau on the North Kaibab Ranger District. (AR 7430.) The area within the Jacob-Ryan project boundary is considered goshawk habitat in its entirety. (AR 7653.)

The stated purpose of the Jacob-Ryan Project is "to improve habitat for northern goshawks and their prey species." (AR 7647.) The Project will also "reduce the risk of destructive crown fires in the project area." (*Id.*)

To achieve these objectives the Project thins and regenerates groups of ponderosa pine, and conducts prescribed burning operations. (*Id.*) Specifically, the Project would log 4,529 acres in goshawk nest areas, 6,293 acres in "even-aged" goshawk post-fledgling and foraging areas, and 14,475 acres in "uneven-aged" post-fledgling and foraging areas. (AR 7426.) The Forest Service is applying the canopy cover requirements of the 1996 Plan Amendment at the "group" scale for the Jacob-Ryan logging project, instead of the larger "stand" scale. (*See, e.g.*, AR 7430.)

In January 2012, the Forest Service issued the Environmental Assessment (" EA") and Decision Notice/Finding of No Significant Impact with respect to the Jacob-Ryan

- 3 -

1 Project. (AR 7405, 7648.)

2 Plaintiffs submitted comments on the Project (AR 384, 6486), and filed an
3 administrative appeal on February 22, 2012. (AR 7686.) The Forest Service denied the
4 appeal on April 3, 2012. (AR 8217.)

## II.  STANDARD OF REVIEW

The National Forest Management Act ("NFMA") requires the Forest Service to develop and maintain forest resource management plans. 16 U.S.C. § 1604(a). After a forest plan is developed, all subsequent agency action must comply with NFMA and the governing forest plan. *Id.*; *see Lands Council v. McNair (Lands Council II)*, 537 F.3d 981, 989 (9th Cir. 2008) (en banc). The Forest Service is entitled to deference with respect to its interpretation of its own Forest Plans, unless the interpretation "is plainly inconsistent with [a Forest Plan]." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005); *see Earth Island Institute v. U.S. Forest Service*, 697 F.3d 1010, 1013 (9th Cir. 2012).

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., contains procedural requirements designed to ensure the decision-maker will have detailed information on environmental impacts and to provide that information to the public. *Inland Empire Pub. Lands Council v. United States Forest Service*, 88 F.3d 754, 758 (9th Cir. 1996). "In contrast to NFMA, NEPA exists to ensure a process, not to mandate particular results." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002). The agency must only take a "hard look" at its proposed action. *Id.* at 1070.

"Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act ('APA')." *Native Ecosystems Council v. United States Forest Service*, 428 F.3d 1233, 1238 (9th Cir. 2005). "Under the APA, [a court] may set aside an agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

"Review under the arbitrary and capricious standard 'is narrow, and we do not

- 4 -

1  substitute our judgment for that of the agency.'" *Lands Council II*, 537 F.3d at 987.

2  Therefore, an agency's decision can be set aside

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (internal quotation marks omitted).

Courts may resolve APA challenges by summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

## III.   DISCUSSION

### A.   NFMA Claim

At issue is the Forest Service's decision to measure VSS distribution and canopy cover at the smaller group, as opposed to the larger stand, level for uneven-aged stands. Plaintiffs argue that this represents a change in management direction that is inconsistent with the Forest Plan. According to Plaintiffs, measurements taken at the group level will result in more open space, to the detriment of the goshawk population. Plaintiffs argue that this constitutes a "significant" change in the Forest Plan, requiring an amendment pursuant to the NFMA's procedural requirements. *See* 16 U.S.C. § 1604(f)(4).

#### 1.   VSS, canopy cover, and interspace

In order to evaluate Plaintiffs' argument it is necessary to understand the terms "group," "stand," and "site" as they appear in the administrative record.

The 1988 Forest Plan provides that, "Distribution of habitat structures (tree size and age classes, tree groups of different densities, snags, dead and down woody material, etc.) should be evaluated at the ecosystem management area level, at the mid-scale such as drainage, and at the small scale of site." (AR 34.) The Forest Plan does not include a glossary definition for "site," but refers to "tree group" and "site" as the same type of unit, which it

- 5 -

characterizes as "[t]he most specific scale at which resource operations and improvements are planned and executed," and describes as "ten to less than one acre" in size. (AR 13.) The Forest Plan glossary offers the following definition of "stand": "An aggregation of trees or other growth occupying a specific area and sufficiently uniform in composition (species), age arrangement, and condition as to be distinguishable from the forest or other growth on adjoining areas." (AR 157.)

The 1992 Management Recommendations define "stand" as "[a]n area of trees possessing sufficient uniformity (species composition, age, and physical features) to be distinguishable from trees on adjacent areas." (AR 266.) The document also states that VSS is a "forest description based on the tree diameter in a stand." (AR 187.)

The 1995 Environmental Impact Statement ("EIS") prepared for the 1996 Amendment defines "site" and "stand" as the same unit: "An area of trees possessing sufficient uniformity (species, composition, age, and physical features) to be distinguishable from trees on adjacent areas. Sites contain patch(es) and groups." (AR 8677.)

In 2007, the Forest Service issued an "Implementation Guide Region 3, Northern Goshawk Standards and Guidelines." (AR 7857.) The Guidelines call for the Forest Service to measure canopy cover at the group scale (which ranges from half an acre to four acres) rather than the stand scale (30 to 100 acres). (AR 7865.)

In 2009, the Forest Service developed a document entitled "Implementation and Interpretation of Management Recommendations for the Northern Goshawk, detailing the Forest Service's interpretation of the Forest Plan and 1996 amendment, which was used in preparing the Jacob-Ryan Project. (AR 269.) The implementation document calculates VSS and canopy cover at the group level for uneven-aged stands. (AR 285–87.)

The 2012 Jacob-Ryan EA defined "group" as "a cluster of two or more trees with interlocking or nearly interlocking crowns at maturity surrounded by an opening. Size of tree groups is variable depending on forest type and site conditions and can range from fractions of an acre (a two-tree group) (i.e. ponderosa pine, dry mixed conifer) to many acres (i.e. wet

1  mixed conifer, spruce fir)." (AR 7419.) The EA also states that a "group" can range in size
2  from one-quarter acre to four acres. (*See* AR 7509.)

3  Plaintiffs' argument focuses on the 1992 Management Recommendations and the
4  1995 EIS, which equate site and stand. According to Plaintiffs, this definition was
5  incorporated into the Forest Plan through the 1996 Amendment, and therefore, in order to be
6  consistent with the Forest Plan, the Forest Service must calculate VSS and canopy cover at
7  the stand level.

8  The Forest Service argues that the language in the Forest Plan, equating site with
9  group, is controlling. It also notes that the Forest Plan is silent on the question of group
10 versus stand measurement as the proper scale of measurement. Instead, it describes the
11 desired percent distribution of VSS forest and canopy cover requirements. (AR 34–35.)

12 According to the Forest Service, group-level data more accurately reflect the
13 distribution of VSS classes for each stand, allowing a more precise comparison between
14 existing conditions. (Doc. 35 at 17; Doc. 36 at 11.) The Forest Service explains that multiple
15 VSS groups can be found within a single uneven-aged stand. Therefore, "a stand-level
16 approach is not useful in uneven-aged stands because it averages multiple VSS group
17 structures and thereby classifies the stand as a single VSS class—which does not reflect the
18 stand's uneven-aged characteristics." (Doc. 36 at 11; *see* AR 522 ("A stand VSS . . . has little
19 utility in uneven-aged management because it reveals very little about differences between
20 existing and Plan desired conditions.")).

21 The Forest Service is entitled to deference to its interpretation of its own Forest Plan
22 unless the interpretation is plainly inconsistent with the Plan. *See Earth Island Institute*, 697
23 F.3d at 1018 (citing *Native Ecosystems Council*, 418 F.3d at 960). If the plan is ambiguous,
24 courts "defer to the Forest Service's reasonable interpretation of the Forest Plan's
25 requirements." *Ecology Center v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009). As
26 discussed above, the Forest Plan is ambiguous with respect to the scale at which canopy
27 cover and VSS are to be measured. The Forest Service's decision to carry out these
28

- 7 -

1  calculations at the group level is reasonable and entitled to deference. It was within the Forest
2  Service's discretion to choose its methodology in making its calculations, and the Forest
3  Service explained why taking measurements at the group level is a reliable method of
4  assessing the condition of the Forest. *See Lands Council v. McNair*, 629 F.3d 1070, 1078 (9th
5  Cir. 2010) (citing *Lands Council II*, 537 F.3d at 994).

6        Plaintiffs also allege that calculating VSS and canopy cover at the group level will
7  create additional "interspace"—openings between groups of trees—outside of the VSS
8  classes, another significant change in management direction requiring a amendment to the
9  Forest Plan. (Doc. 28 at 12.) Plaintiffs assert that the interspace between groups of trees is
10 no longer included in canopy cover calculations. (*Id.*) By addressing VSS and canopy cover
11 at the group level, the space between these groups is dropped from the calculation, which,
12 according to Plaintiffs "allows for a much more open forest." (Doc. 45 at 6.)

13       Plaintiffs rely on the 2007 Goshawk Guidelines as evidence that the Forest Service
14 changed management direction with respect to the creation of interspace. (*See* Doc. 28 at 4.)
15 Specifically, Plaintiffs contend that the Guidelines' call for measuring canopy cover from
16 "dripline to dripline of the group" would result in interspace outside the six VSS groups that
17 would not be considered in canopy cover calculations for VSS 4, 5, and 6 groups. (AR 7866.)
18 Plaintiffs cite a 2007 briefing paper in which the Forest Service acknowledged that the
19 Guidelines "include some concepts that would open forest canopies to a degree not
20 articulated in the 1996 Forest Plan amendment." (AR 8147.) They also point to comments
21 from the Arizona Game and Fish Department expressing concern "about a shift in how the
22 Forest Service implements their own Northern Goshawk Guidelines within the current Forest
23 Plan." (AR 7013.)

24       In response, the Forest Service concedes that the Guidelines contained concepts that
25 are inconsistent with the Forest Plan. The Forest Service contends, however, that any
26 inconsistency is irrelevant because the 2007 Guidelines was a "draft document" that was
27 never finalized and "the Forest Service did not rely on guidance from, or cite to, the Guide"
28

- 8 -

in developing the Jacob-Ryan Project. (Doc. 35 at 13.) As stated in the 2007 briefing paper, the Forest Service maintains that because the "guide alone does not automatically ensure compliance with existing forest plans . . . [u]ltimately, current Forest Plan direction takes precedence over the implementation guide." (AR 8147.) The Forest Service has consistently denied that it redefined its approach to goshawk management. (*See* AR 7592–95.)

The Forest Service maintains that its approach does not create any category of interspace outside of the six VSS groups. (Doc. 35 at 12.) All openings are either considered in canopy calculations for VSS 4–6 or considered to be part of VSS 1. (*Id.*) Therefore, the entire forest is accounted for in one of the VSS categories. (*Id.*) Contrary to Plaintiffs' assertion, the Project did not create a new class of interspace by adopting the "dripline to dripline" approach set out in the 2007 Guidelines.

Whether or not the Forest Service's decision to calculate VSS and canopy cover on a group rather than stand basis represents a change in direction, such an approach is not inconsistent with the Forest Plan. The Jacob-Ryan EA did not alter the canopy cover and VSS requirements set forth in the Plan. Moreover, as discussed next, a site-specific amendment was not required for the Jacob-Ryan Project.

### 2. Amendment

In support of their argument that a plan amendment was required prior to authorization of the Jacob-Ryan Project, Plaintiffs first cite other projects in which "the Forest Service has repeatedly recognized the need to amend the applicable Forest Plan prior to implementing its new Goshawk Guidelines." (Doc. 28 at 18.) The projects are Jack Smith, in the Coconino National Forest; Clints Well, also in the Coconino National Forest; Rim Lakes, in the Apache Sitgreaves National Forest; McCracken, in the Kaibab National Forest; and the Four Forest Restoration Initiative, in Kaibab and Coconino National Forests.[4]

---

[4] Plaintiffs have lodged several exhibits in support of this argument, attached to a declaration by their counsel. (Doc. 29.) The Forest Service has moved to strike this material as outside the administrative record and therefore beyond the Court's review under the APA.

- 9 -

The Forest Service argues that several of the projects cited by Plaintiffs concern different National Forests and therefore "are potentially subject to different plan requirements due to their individual locations, forest types, site history, and differing requirements in each Forest Plan for specific management units." (Doc. 35 at 21–22.) Also, the Clints Well, Rim Lakes, and Four Forest projects are not the subject of final agency decisions, but are still subject to modifications before they become finalized. (*See* Doc. 39, Ex. 2.) Finally, the other projects or proposed projects are distinguishable because, unlike the Jacob Ryan Project, they call for the creation of interspace between VSS groups. For instance, with respect to the McCracken Project, the Forest Service included an amendment "to allow the ponderosa pine cover type within 15% of the project area to be managed at less than forest plan specified minimums for canopy cover in goshawk habitat in VSS 4 through 6 groups." (Doc. 40, Ex. 1, ¶ 4.) The Forest Service also rejected an alternative based on the 2007 Guidelines because it would have created "areas within stands that was considered to be outside of VSS 1 through 6 groups" and therefore would have required an amendment. (*Id.*, ¶ 5.)

Unlike these projects, for which the Forest Service proposed or implemented an amendment, the Jacob Ryan Project did not change the Forest Plan's direction regarding interspace as it relates to VSS classes or regarding measurement of canopy cover.

As additional support for their claim that a Forest Plan amendment was required, Plaintiffs cite three cases in which courts found that a change in management direction necessitated public participation and the preparation of an amendment: *Oregon Natural Res.*

---

(Doc. 38 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).) The Forest Service also lodged several declarations and exhibits to address the materials submitted by Plaintiffs. (Doc. 39.) Plaintiffs contend that the Court may consider the extra-record materials because they are necessary to determine whether the Forest Service has considered all relevant factors and has explained its decision. (Doc. 47.) At oral argument the Forest Service asked the Court, as alternative to striking Plaintiffs' exhibits, to consider the materials it submitted. The Court has taken that course, and has reviewed all of the materials submitted by Plaintiffs and the Forest Service.

- 10 -

1  *Council Fund v. Forsgren ("ONRC")*, 252 F. Supp.2d 1088 (D.Or. 2003); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006); and *House v. U.S. Forest Serv.*, 974 F.Supp. 1022 (E.D.Ky. 1997). These cases concerned significant and substantive changes in the applicable plan, and are therefore distinguishable from the present matter.

In *Klamath Siskiyou*, the Bureau of Land Management argued that a policy change that reclassified the status of the red tree vole, removing it from management protection, was plan "maintenance" that did not require formal amendment procedures. *Id.* at 556. The court disagreed, noting that the reclassification was based on 80% "new data" and could not "reasonably be defined as anything other than a change in a 'term or condition' in the resource management plan." *Id.* at 560. Therefore, the decisions permitting timber sales that could affect the red tree vole were set aside. *Id.* at 556.

In *House*, the plaintiffs challenged a proposed timber sale located in an area containing a cave system that was home to an endangered species of bat. The project was approved on the basis of three new policies that, according to the plaintiffs, amounted to a "significant," de facto amendment of the Forest Plan. 974 F.Supp. at 1034. The court agreed, rejecting the Forest Service's argument that the policies merely clarified existing standards and guidelines. *Id.* Instead, the court found that the policies provided additional guidelines and were required to undergo public notice and comment procedures under the NFMA. *Id.*

In *ONRC*, the plaintiffs challenged three timber sales that were approved on the basis of new mapping directions regarding lynx habitat and a revised document regarding lynx conservation strategies, neither of which had been subjected to public comment. 252 F.Supp.2d at 1099. The mapping direction instructed regional foresters and supervisors to apply a narrower definition than previously had been applied to lynx habitat, leading to a reduction in the territory in which lynx conservation strategies were required. *Id.* at 1092. The court found that the documents amounted to "significant" amendments of the forest plan requiring public involvement under the NFMA. *Id.*

By contrast, the Forest Service's decision to calculate VSS and canopy cover at the

- 11 -

group level does not constitute a "significant"change to the Forest Plan. As discussed above, the Plan, while specifying the "desired percent distribution of VSS forest, and canopy cover requirements for VSS 4–6 forest groups, and the required scales of analysis," is ambiguous with respect to the level at which measurement are to be taken. (AR 7654.) The Jacob-Ryan EA is consistent with the Forest Plan's objectives. (*Id.*) The Forest Service's decision to carry out measurements at the group level simply clarifies the guidelines for determining progress toward the desired forest conditions.

### B.     NEPA Claim

Plaintiffs next contend that the Jacob-Ryan EA violates NEPA by failing to disclose evidence that goshawks are in decline and failing to address conflicting science, controversy, and uncertainty regarding the management of goshawks in the Southwest. The Forest Service counters that the EA provided sufficient information about the status of the goshawk population and that it adequately addressed conflicting science about goshawks.

#### 1.     Failure to disclose that goshawks are in decline

According to Plaintiffs, the "Jacob-Ryan EA fails to provide objective data and information concerning the status and population trend of goshawks in the region." (Doc. 28 at 18.) Specifically, Plaintiffs fault the EA for failing to fully disclose the findings of the Forest Service's 2010 Management Indicator Species Report ("MIS"). (*Id.* at 18–19.)

The MIS states that "goshawk reproduction on the Kaibab Plateau has been highly variable over 15 years and overall showed a significant decline from 1991 to 2005." (AR 4671–72.) Factors cited for the decline include "change in forest composition and structure resulting from intensive forest management between the 1960s and early 1990s (large seed tree cuts) combined with catastrophic fire and wind throw, and natural environmental variation in prey abundance." (AR 4672.) The variation in prey abundance is likely due to "inter-annual fluctuations in precipitation and conifer seed production." (*Id.*) "Given that the demographics appear influenced by precipitation patterns, it is difficult to judge if the population is stable or declining." (AR 4672.) The MIS Report concluded that:

> northern goshawks are assumed to be declining on the Kaibab National Forest. However, if future weather patterns produce good precipitation, the population could stabilize. Only precipitation can fuel forest productivity in terms of abundant seed crops which result in prey population increases that occur at greater frequencies. Continued reduction of forest stem density and basal area should ameliorate the stochastic nature of weather by reducing the threat of large-scale, high-severity crown fire, thereby helping stabilize the population.

(AR 4674.)

Plaintiffs acknowledge that the EA contains references to the MIS Report but assert there is a "disconnect" between the information set out in the documents. (Doc. 28 at 19.) As evidence of this disconnect, Plaintiffs cite the following passage from the EA:

> The Kaibab Plateau has historically held one of the most concentrated populations of goshawks known in North America. Goshawks are relatively abundant and widespread, and although population trends are difficult to determine, there is no hard evidence of purported decline in the west (NatureServe 2010). On the North Kaibab, northern goshawk territories have been monitored every year since 1991 and the decline of breeding pairs that reached an all-time low in 2003 has steadily been increasing. Potential management impacts and population trend data are summarized at the forest-level in USDA Forest Service (2010 page 26).

(AR 7513–14.)

Plaintiffs also cite the EA's conclusion that the Jacob-Ryan Project is "not likely to alter current forest-wide habitat or population trends." (AR 7514.) According to Plaintiffs, "what the EA fails to disclose or consider is that this would mean the continued *decline* of goshawks, as found in the 2010 report." (Doc. 28 at 19.) Therefore, Plaintiffs assert, the EA violates NEPA by "providing a conclusion . . . that is unsupported and contradicted by the agency's own report." (*Id.*)

The Forest Service argues that the EA provides sufficient information about the status of the goshawk population, including accurate summaries of the findings in the 2010 MIS Report, which the EA incorporated by reference. The Court agrees that the EA satisfied NEPA.

An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). An EA is sufficient if it provides enough "evidence and analysis for determining

- 13 -

whether to prepare an [EIS] or a [FONSI]." *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

"An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008). In *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (1998), *overruled on other grounds by Lands Council II*, 537 F.3d at 997, the court explained that "NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion." *See Castaneda*, 574 F.3d at 667 ("NEPA requires that the Forest Service disclose the hard data supporting its expert opinions to facilitate the public's ability to challenge agency action."). However, it is not the court's role "to tell the Forest Service what *specific* evidence to include, nor how *specifically* to present it." *League of Wilderness Defenders-Blue Mountains v. United States Forest Service*, 549 F.3d 1211, 1218 (9th Cir. 2008); *see Castaneda*, 574 F.3d at 667 ("We defer to an agency's choice of format for scientific data.").

In addition, as the Forest Service notes, federal regulations instruct agencies to incorporate material into NEPA documents by reference when the effect will be to cut down on bulk and avoid undue length without impeding agency or public review of the action. 40 C.F.R. § 1502.21; *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214 (9th Cir. 2004) (rejecting claim that FEIS was inadequate because it failed to make available the biological opinions upon which it was based).

The Jacob-Ryan Project EA does not ignore the 2010 MIS Report or contradict its assumption that the goshawk population of the Kaibab National Forest has been in decline. Moreover, the EA appropriately incorporates the MIS Report by reference. The Report itself is "available for inspection by interested persons." *City of Sausalito*, 386 F.3d at 1214; *see Castaneda*, 574 F.3d at 667. The EA contains "sufficient reference to the issues at hand and

- 14 -

the places in the record where a more detailed discussion can be found." *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F.Supp.2d 1195, 1213 (D.Mont. 2010).

### 2. Failure to address conflicting science

Plaintiffs allege that the Jacob-Ryan EA violates NEPA by failing to disclose and discuss opposing scientific views. (Doc. 28 at 20.) The opposing scientific view to which Plaintiffs refer is set forth in a 2008 report by Robert Beier. The report evaluated the effect of the 1992 Management Recommendations on the goshawk population in the Apache-Sitgreaves National Forest and "found a moderate negative correlation between goshawk productivity and the forest structure prescribed by the guidelines." (AR 6876.) Plaintiffs argue that the Beier Report contradicts the claim in the Jacob-Ryan EA that "[f]ollowing the forest plan and hence the goshawk guidelines" is likely to be beneficial to goshawks. (AR 7510.)

The Forest Service argues that it adequately addressed conflicting science about goshawks. First, it contends that it was not required to respond to the 2008 Beier Report because NEPA's mandate to discuss opposing views applies only to a final EIS. The Forest Service is correct. In *Earth Island Institute*, the Ninth Circuit explained that "[i]n the context of environmental impact statements, NEPA requires agencies to respond explicitly and directly to "responsible opposing view[s]." 697 F.3d at 1020 (quoting 40 C.F.R. § 1502.9(b)). The Court refused to extend that requirement to EAs. *Id.* (citing *N. Slope Borough v. Minerals Mgmt. Serv.*, 343 Fed.Appx. 272, 275 (9th Cir. 2009)). Therefore, the Jacob-Ryan EA did not violate NEPA by failing to discuss the Beier Report.

The Forest Service argues that even if it were required to address dissenting scientific views, it met that requirement by reviewing the Beier Report and addressing it in the EA's response to comments. (AR 7595–96.) The Forest Service asserts that after reviewing the Beier Report it reasonably chose to rely instead on the findings of its own scientific expert, Dr. Richard Reynolds, who had 21 years of local knowledge and research. (Doc. 35 at 20.) Dr. Reynolds found that the Beier Report was of limited value due to its small sample size,

focus on a separate national forest, and measurement of canopy cover at the stand level. (AR 8301–21.) The Forest Service included these criticisms of the Beier Report in its response to comments. (AR 7595–96.) These responses are sufficient to address opposing scientific views. *See Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1037 n.5 (9th Cir. 2012) (explaining that "courts may consider responses to comments for confirmation that an agency has taken a 'hard look' at an issue under NEPA"); *Earth Island Institute v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010) ("agencies have broad discretion in choosing how to respond to opposing scientific evidence"). The Forest Service was entitled to rely Dr. Reynolds' expertise in responding to the Beier Report. *See Lands Council II*, 537 F.3d at 988 (explaining that courts do not "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest Plan, and orders the agency to explain every possible scientific uncertainty"); *Castaneda*, 574 F.3d at 659 (noting that it is not the court's "role to weigh competing scientific analyses").

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that the Forest Service, in approving the Jacob-Ryan Project, violated neither the NFMA nor NEPA. Because its decision to approve the Project was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the Forest Service is entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** granting the Forest Service's motion for summary judgment (Doc. 33) and denying Plaintiff's motion for summary judgment (Doc. 27).

**IT IS FURTHER ORDERED** denying the Forest Service's motion to strike (Doc. 38).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment for the Forest Service.

1   DATED this 22nd day of January, 2013.

Paul G. Rosenblatt
United States District Judge